IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **07-cv-00046-JLK**

**DANIEL MALASKY**,

      Plaintiff,

v.

**DIRT MOTOR SPORTS, INC.**, **a corporation,**

      Defendant.
_____

**MEMORANDUM OPINION AND ORDER**
_____
KANE, J.

    Dirt Motor Sports, Inc. f/k/a Boundless Motor Sports Racing Inc. ("Dirt," "Boundless" or "the company") hired Daniel Malasky ("Malasky") pursuant to a 2-year employment contract. Malasky completed his term, but the contract was not renewed. Malasky sued alleging three breach of contract claims and one promissory estoppel claim. Pending is Dirt's motion for summary judgment. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND.

    Because this is a motion for summary judgment, the following facts and inferences are cast in the light most favorable to Malasky. Dirt, a racing and sports entertainment company with offices in Colorado Springs, entered into an employment contract with Malasky for him to serve as the company's Senior Vice President and General Counsel. Malasky left the law firm of Piper Rudnick in D.C. and moved to Colorado for his new job.

On September 22, 2004, Malasky attended a meeting in North Carolina with three senior officials of the company. There, among other things, the parties discussed a $100,000 salary, an annual review for a salary increase and bonus, and an entitlement to stock/stock options offered to other employees. Dirt offered Malasky the job at the end of the meeting, and Malasky said he would consult his wife and get back to Dirt. Shortly thereafter, Malasky and his wife visited Colorado Springs.

At the company's request, Malasky prepared an initial draft of a written employment contract[1] and the parties negotiated and exchanged drafts back and forth. Malasky concedes that, at this point, all of the terms of the contract were still open to negotiation. Ex. A-13 at 128:10-13. In the October 3, 2004 draft of the agreement, Malasky proposed a salary of $110,000 for the first year and $120,000 for the second year. Ex. A-3. The company reduced Malasky's first year salary to $100,000. Ex. A-13 at 128:1-19. Additionally, the October 3, 2004 draft provided Malasky a right to purchase additional shares of common stock on an annual basis "at a price and on terms that are at least as favorable as those granted to other senior officers." Ex. A-3. The company requested "at least as favorable as" be changed to "comparable to." Ex. A-1; Ex. A-13 at 133:17-23. Following these negotiations, the parties signed the written contract on October 4, 2004.[2] The parties agree that this is an "integrated bilateral contract." Ex. A-1 ¶ 9;

---

[1] Malasky had drafted and reviewed numerous contracts in his capacity at Piper Rudnick, but had never drafted an employment contract.

[2] Malasky makes the tenuous assertion that although he signed the agreement on Oct. 4, 2004, he accepted the offer of employment before that time. His deposition indicates that "We had discussed that I was going to be working for the company. It was a matter of formally drafting and completing an employment agreement. But it was the understanding of all parties involved that we were in agreement as to the material terms, definitive terms of the agreement." Ex. A-13 at 123:18-23. Despite Malasky's claim, the parties continued to negotiate material terms (i.e. salary) up until the day before the execution of the written agreement. *Compare* Ex. A-3 ¶ 1.A *with* Ex. A-1 ¶ 1.A.

2

Ex. A-13 at 207:1-2. The agreement shall be construed and enforced according to Colorado law. Ex. A-1 ¶ 7.

Malasky began his term of employment on October 19, 2004. He received 10,000 shares of common stock more than two months after his start date, even though the contract provided that he should receive the stock "immediately upon employment." Malasky complains not only that the shares were delivered late but also that the stocks were unregistered and restricted which further delayed the opportunity to sell them. The contract contained no explicit language regarding registration or restrictions, but Malasky has admitted that he expected the issuance of the 10,000 shares of stock to comply with the law, which included a one-year holding period. Ex. A-13 at 178:12-179:1.

In June 2005, Dirt underwent a leadership change and closed its office in Colorado Springs. Malasky continued to work from Colorado, though the company's offices were in Oklahoma. In November 2005, Malasky sent an email to the Chief Financial Officer (Carter) requesting an annual review for a bonus as agreed upon in the contract. Ex. A-1 ¶ 1 (last section without alphanumeric identifier). Malasky asserts that the industry standard for an in-house counsel annual bonus is 50% of the employee's salary. Ex. A-13 at 200:3-201:11. After receiving Malasky's emails, Carter did not conduct a review of Malasky's performance as required by contract;[3] however, he gave Malasky a raise to $150,000 for the second year of employment. The company did not regularly give annual performance bonuses to its employees.

---

[3] It is disputed whether the performance review was in accordance with the written contract, but for the purposes of summary judgment, the facts and inferences are viewed in a light most favorable to nonmovant.

Dirt hired four senior officers during Malasky's tenure and gave them options to purchase 300,000 shares of stock upon their employment. One senior official also received 300,000 shares for his exemplary services, as a form of bonus. Malasky contends that the contract entitled him to receive those same benefits. Although Malasky served the full two years of his contract term, Dirt did not renew the contract.

## II. DISCUSSION.

### A.

### Legal Standards

Summary judgment is appropriate where the moving party demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The factual record and reasonable inferences therefrom are construed in the light most favorable to the nonmovant. *See Simms v. Okla. ex rel. Dep't Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

Whether a written contract is ambiguous and how ambiguities should be construed are questions of law. *Lake Durango Water Co., Inc. v. Pub. Utils. Comm'n*, 67 P.3d 12, 20 (Colo. 2003). Further, a motion for summary judgment is an appropriate context within which to evaluate contract interpretation as a matter of law. *Roberts v. Am. Family Mut. Ins. Co.*, 144 P.3d 546, 548 (Colo. 2006).

In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meanings of the words used, and reference must be made to all the agreement's provisions. *Fibreglas*

*Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990). Mere disagreement of the parties does not necessarily indicate the documents are ambiguous. *East Ridge of Fort Collins, LLC v. Larimer and Weld*, 109 P.3d 969, 974 (Colo. 2005). Rather, a contract is ambiguous if it is fairly susceptible to more than one interpretation. *Id.* The court, however, should avoid a hyper-technical reading of the contract to defeat the intention of the parties. *Ad Two Inc. v. City & County of Denver*, 9 P.3d 373, 377 (Colo. 2000). If a contract is determined to be ambiguous, the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues. *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996).

## B.

## Claim 1 – Breach of Contract, Signing Bonus

The employment contract provides Malasky would receive stock at the outset of his employment. The entire contract term reads:

> Boundless agrees . . . to compensate Malasky . . . as follows:
> 1(C)   Ten thousand (10,000) shares of Boundless Series A Common Stock to be issued to Malasky immediately upon employment.

Malasky asserts Dirt breached two parts of this provision: (1) the "immediately upon employment" term and (2) the type of stock issued (the company gave him "restricted" and "unregistered" securities. It is undisputed that Malasky's Series A Common Stock was issued and delivered two and a half months after his start date. Dirt denies the delay constitutes a material breach and argues it is therefore not actionable. In response, Malasky argues that because he performed the entire contract, he can sue for any breach, not just material ones. *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005).

5

Malasky is correct that he may sue for any breach. Restatement (Second) of Contracts § 236 cmt. a (1981) ("Every breach of contract gives rise to a claim for damages, and may give rise to other remedies"). Even if the injured party sustains no pecuniary loss or is unable to show such loss with sufficient certainty, he has at least a claim for nominal damages. *Id.*; *Gen. Ins. Co. of Am. v. City of Colo. Springs*, 638 P.2d 752, 759 (quoting Restatement (Second) of Contracts § 346 (1981)). Material breach generally operates to excuse future performance of the nonbreaching party. *Coors*, 112 P.3d at 64. In this case, however, the question of material breach is irrelevant because the contract was completed, and Malasky is not seeking to release himself from future performance. As a result, Malasky is not limited to recovering for material breaches only.

The second part of Malasky's claim is that the company breached the agreement by giving him "restricted" and "unregistered" stock, which he could not sell immediately. Dirt denies any agreement existed between the parties regarding these terms and argues the contract contains no language regarding registration or restrictions. Malasky acknowledges he expected all stock certificates issued by the company to comply with the law, which includes a mandatory one-year holding period as required by SEC Rule 144. 17 C.F.R. § 230.144(d) (2005) ("A minimum of one year must elapse between the later of the date of the acquisition of the securities from the issuer or from an affiliate of the issuer, and any resale of such securities"). Despite this restriction, Malasky argues that he relied on representations that he could not sell the stocks for

*two* years based on conversations with Mr. Carter, Colorado Mountain Transfer (the company's securities transfer agent) and Mr. Dahlson from Jackson Walker.[4] Ex. A-13 at 162:12-22.

If the contract is susceptible to more than one reasonable interpretation, it is ambiguous, and its meaning must be determined as an issue of fact. *Pres. at the Fort, Ltd. v. Prudential Huntoon*, 129 P.3d 1015, 1017-18 (Colo. App. 2004). Silence does not by itself necessarily create ambiguity as a matter of law, but silence does create ambiguity when it involves a matter naturally within the scope of the contract. *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993) (interpreting silence in contract regarding compensation for unused vacation time as ambiguous). Another possibility is that an omission occurred. For example, the parties may have had expectations but failed to manifest them. Restatement (Second) of Contracts § 204 cmt. b (1981); *Costello v. Cook*, 852 P.2d 1330 (Colo. App.1993).

The contract is silent on whether the stock would be "registered" or "restricted" beyond that required by the SEC. Though the plain language of the contract states some details of the stock (e.g. "Boundless Series A Common Stock"), delays and other encumbrances are within the scope of contract. The absence of these terms suggests several possibilities including: there was no agreement regarding the terms; the parties had an agreement but failed to express it; or the parties had differing perceptions which they mistakenly believed the other shared. Thus, there is an ambiguity in the contract regarding whether the holding period was to be more than one year, and Dirt is not entitled to summary judgment based on any failure of Malasky to establish a viable theory of breach.

---

[4] It is unclear why these persons told Malasky that he must wait two years instead of one or if that representation was in error. Neither Mr. Carter nor Mr. Dahlson is a party to this action and Malasky asserts no claim for negligent misrepresentation based on the misrepresentation.

7

Even though Malasky established a viable breach of contract claim in theory, his biggest obstacle is establishing he has suffered economic damages. Malasky contends that he suffered economic damage from his inability to sell the stock at a higher price during the two and a half month delay and during the time that additional restrictions were placed upon the stock In breach of contract actions involving future damages, a plaintiff is required to prove both *the fact* of the injury and the amount of the loss. *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1382 (Colo. 1993) (emphasis added). Mathematical precision in calculating damages is not required, but the fact that some damage actually occurred is necessary. *Hoff & Leigh, Inc. v. Byler*, 62 P.3d 1077, 1079 (Colo. App. 2002). The Colorado Supreme Court has explained: "The rule which precludes the recovery of uncertain and speculative damages applies only to situations where the fact of damages is uncertain, not where the amount is uncertain." *Peterson v. Colo. Potato Flake & Mfg. Co.*, 435 P.2d 237, 239 (Colo. 1967). In dealing with securities, it cannot be assumed that resale would have followed in the normal course of events. *Kaufman v. Diversified Indus., Inc.*, 460 F.2d 1331 (2d Cir. 1972), *cert. denied*, 409 U.S. 1038-39 (1972).

Malasky has marshaled scant evidence that the claimed restrictions or delays harmed him in fact, but it is enough to survive summary judgment. The evidence in support of damages comes from Malasky's deposition after the lawsuit was filed. These statements indicate that Malasky believed there was "a strong likelihood that [he] would have sold [the shares] when [his] roles became diminished within the company." Ex. A-13 at 168:1-14. To the extent his role became diminished during the time resale of the stock was restricted, he has come forward with sufficient facts to support an inference of actual harm. Additionally, Malasky recalled that he tried to transfer the shares when he received them (even though this was during the one-year

8

holding period as required by the SEC). Ex. A-13 at 165:7-16. At oral argument on May 13, 2008, plaintiff's counsel represented that Malasky "consistently" tried to lift the restrictions on the stock purchases. This evidence is enough to raise an inference that Malasky in fact suffered harm.

The law is in an uncertain state as to how to treat the *lost opportunity* to sell stock shares at a more favorable price. The Second Circuit has held that the delayed tender of securities is not compensable where the buyer showed no evidence that he intended to sell the stocks when they finally arrived. *Kaufman*, 460 F.2d at 1336-38. In contrast, at least one district court has fashioned an equitable remedy to prevent the perils of uncertainty from being laid at the defendant's door. *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 594, 608-11 (S.D.N.Y. 1977). I reserve ruling on this issue, but find it dubious on the facts presented that Malasky can, in fact demonstrate harm or articulate a viable theory for quantifying his loss.

In short, it is uncontested that Dirt's late issuance of stock was in breach, but there is a dispute about whether the parties' agreement envisioned additional restrictions beyond that required by the SEC. Regardless, Malasky faces significant challenges in proving the existence of any actual damages. In a sense, Malasky asks the court to assume that he would have played the stock market favorably. Had the company's stock price increased instead of fallen, Malasky would have received a windfall by holding the stock. The court will revisit the issue, but for now Dirt's motion for summary judgment as to claim one is DENIED.

### C.
### Claim 2 – Breach of Contract, Additional Stock Purchases

At issue in the second claim is whether the contract provision is an enforceable promise. The provision states:

> Boundless agrees . . . to compensate Malasky . . . as follows:
> 1(D) The absolute right of Malasky, at his option, to purchase additional shares of Bound Series A Common Stock on an annual basis in an amount to be determined by the Boundless Board of Directors, at a price and on terms that are comparable to those granted to other senior officers of Boundless.

Malasky interprets the language as if it were a condition precedent (i.e. if another senior official of the company receives stock or stock options, then the company shall offer those benefits to Malasky). Dirt claims that the contract provision is unenforceable because it leaves complete discretion with Dirt. Additionally, Dirt argues that even if the provision were valid, Dirt could not breach it by offering zero shares (because that was within its discretion).

Conditions precedent are not favored interpretations and will not be given effect unless established by clear and unequivocal language. *Dinnerware Plus Holdings, Inc. v. Silverthorne Factory Stores, LLC*, 128 P.3d 245, 247 (Colo. App. 2004). No particular form of language is necessary to make an event a condition, although such words as "on condition that," "provided that" and "if" are often used for this purpose. Restatement (Second) of Contracts § 226 cmt. a (1981). Plaintiff cites a case where there is specific language that would lend itself to an interpretation of a condition precedent. *Dinnerware*, 128 P.3d at 248 (holding "provided that" generally establishes a condition precedent).

The instant contract provision contains no language which could be interpreted as "if the company offers stock to senior employees, then it must also offer comparable stock to Malasky." First, there is no conditional language within the contract provision. Moreover, such an interpretation conflicts with the language "on an annual basis." If Malasky intended the

10

provision to activate every time the company gave stock to another senior employee, then the timing would be inconsistent with "on an annual basis."

The language of the provision amounts to an illusory promise. Words of promise which by their terms make performance entirely optional with the "promisor" do not constitute a promise. Restatement (Second) of Contracts § 77 cmt. a (1981); *Sentinel Acceptance Corp. v. Colgate*, 424 P.2d 380, 382 (Colo. 1967). Dirt had unrestricted discretion to set the amount of the shares it would offer Malasky. Though the provision is unclear as to what is meant by "terms," the amount of shares is explicitly covered by the language "in an amount to be determined by the Boundless Board of Directors." To construe "terms" as relating to the quantity of shares offered would render prior language meaningless. The court should not infuse ambiguity into a contract simply because it is poorly drafted. Accordingly, Dirt's motion for summary judgment is GRANTED as to claim two.

**D.**

**Claim 3 – Breach of Contract, Annual Review**

Next, Malasky contends Dirt breached the Contract by failing to conduct an annual performance review to evaluate him for a bonus. The end of paragraph one of the contract states:

> In addition the Board of Directors of Boundless (the "Board"), or a committee thereof, shall review Malasky's performance annually on or before the anniversary date of his employment with Boundless, and may, at its sole discretion, award Malasky a year-end bonus, in an amount determined by the Board or committee, for his performance during the prior twelve-month period.

Malasky asserts that Dirt breached the contract because neither the board nor a committee thereof reviewed his performance to consider whether a bonus should be awarded. He alleges

11

no specific harm or damages resulting from the Board's failure, but states such damages are fact-based and must therefore resolved at trial. Malasky concedes, and it is undisputed, that he received an increased salary of $150,000 after he requested a year-end review.

Any promise of a review-driven bonus is illusory because the decision to award him one, vel non, rests entirely within the discretion of Dirt. Restatement (Second) of Contracts § 77 cmt. a (1981); *Sentinel Acceptance Corp.*, 424 P.2d at 382. Even if this provision were enforceable, Malasky has offered only speculation or conjecture to establish damages. *Terrones v. Tapia*, 967 P.2d 216, 218 (Colo. App. 1998). Malasky attempts to survive summary judgment by asserting that the issue of damages "must be resolved at trial," but this presumes that there is a factual basis for such damages. To avoid summary judgment, the nonmovant must make a showing sufficient to establish an inference of the existence of each element essential to the case. *Hulsey v. Kmart*, Inc., 43 F.3d 555, 557 (10th Cir. 1994). Here, the contract is not only unenforceable, but the record reflects no factual basis for an award of actual (as opposed to nominal) damages. Therefore, Dirt's motion for summary judgment with regard to claim three is GRANTED.

E.

### Claim 4 – Promissory Estoppel, Job Assurance

Dirt makes three arguments in support of its Motion for Summary Judgment on Malasky's promissory estoppel claim: (1) Malasky had an employment contract, which precludes application of promissory estoppel; (2) Malasky has not alleged a promise that is sufficiently definite for promissory estoppel; and (3) continued negotiations on material terms preclude any finding of reliance on the part of Malasky on any of Dirt's promises that preceded execution of the contract.

12

Recovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract. *Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XXII, LLC*, 176 P.3d 737, 741 (Colo. 2007). When there has been mutual agreement by the parties on all essential terms of a contract, the alternative remedy of promissory estoppel is never reached. *Scott Co. of Cal. v. MK-Ferguson Co.*, 832 P.2d 1000, 1003 (Colo. App. 1991); *Vigoda v. Denver Urban Renewal Auth.,* 646 P.2d 900 (Colo.1982). The parties do not dispute that Malasky included in the initial draft all of the terms he thought were going to be operative and relevant. Because the contract contained the essential terms of the agreement, Malasky cannot rely on promissory estoppel to enforce oral promises which were part and parcel of the written agreement. Additionally, illusory promises are not more actionable simply because they are fitted within the context of a promissory estoppel claim. Therefore, the company's statements regarding compensation, stock and stock options, which were within the scope of the written contract and in some cases illusory, cannot be enforced through promissory estoppel.

As a matter of law, Dirt's assurances outside of the written contract regarding career opportunities and involvement with the company are too vague for enforcement through promissory estoppel. Cases addressing the definiteness of promises usually involve the presumption of at-will employment, which is not the case here, where Malasky's contract was for an express 2 year term. If a statement by an employer is merely a forecast of the employee's likely career progression, it is neither a promise nor a statement that could reasonably be relied upon as a commitment. *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 247 (Colo. App. 2006). The company's assurance that Malasky would have "potential to grow with the company" is not sufficiently definite to constitute a binding promise under a theory of promissory estoppel.

13

Furthermore, Malasky's reliance on assurances for long term growth is inconsistent with a negotiated contract for only two years. Similarly, other assurances Dirt made are not sufficiently definite to establish a claim for promissory estoppel such as: Malasky would participate with other senior officers in making key business decisions; he would assist with the company's day-to-day business operations; and he would be treated in the same manner as other senior members of the management. These statements were little more than vague assurances or unsupported predictions, and as such, were not statements upon which Malasky could reasonably rely. *See Dickens v. Equifax Servs., Inc.*, 83 F.3d 431, 1996 WL 192973, *5-6 (10th Cir. 1996) (unpublished opinion) (holding that general promises of compensation and career opportunities were not sufficiently definite for employee who relocated to Denver).

Because Malasky has not asserted more specific promises outside of the negotiated agreement, summary judgment is GRANTED on the promissory estoppel claim. Even were the promissory estoppel claim to survive summary judgment, damages would be a determinative issue. The company provided some reliance costs to Malasky, such as moving expenses. The opportunity cost of leaving a "prestigious" law firm lends itself to the same speculative damages discussed in the other claims.

### III.  CONCLUSION.

Dirt's Motion for Summary Judgment is GRANTED as to claims two, three and four and is DENIED as to claim one. I allow claim one to proceed despite my concerns regarding Malasky's ability to prove he suffered harm or financial loss as a result. It is worth questioning whether either side truly wishes to pursue this claim to trial. The parties should again assess their respective risks as they move forward toward trial and consider if a referral to a magistrate judge

for settlement would be helpful. In the meantime, this case will be set for a pretrial conference by separate minute order.

Dated May 16, 2008.                                           **s/John L. Kane**
                                                              SENIOR U.S. DISTRICT JUDGE